Jennifer A.M.S. Coburn  10307
Law Office of Jennifer Coburn LLLC.
PO Box 29512
Honolulu, HI 96820
Telephone No.: (808) 800-3954
Email: jcoburn@coburnlawoffice.com

Attorney for Plaintiff
RANDALL F. SOBOL

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RANDALL F. SOBOL,<br><br>        Plaintiff,<br><br>        vs.<br><br>LOUIS DEJOY, POSTMASTER GENERAL, UNITED STATES POSTAL SERVICE<br><br>        Defendant. | CIVIL NO.  1:22-cv-00170<br><br><br>COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS IN A CIVIL ACTION |

## **COMPLAINT**

Plaintiff RANDALL F. SOBOL ("Plaintiff"), by his undersigned attorney,

for his complaint against LOUIS DEJOY, POSTMASTER GENERAL, UNITED

STATES POSTAL SERVICE ("Defendant"), alleges as follows:

## **THE PARTIES**

1.  Plaintiff, RANDALL F. SOBOL, at all times relevant to this complaint was

   employed by the United States Postal Service and had a position domiciled in

1

Honolulu, Hawaii.  Plaintiff's physical office location was at the United States

Postal Service Processing and Distribution Center located in Honolulu, Hawaii.

Plaintiff is a citizen of the United States and is a resident of Honolulu City and

County, State of Hawaii.

2.  Defendant, LOUIS DEJOY, POSTMASTER GENERAL, UNITED STATES

POSTAL SERVICE, is sued in his official capacity.  Based upon information

and belief, the United States Postal Service ("Agency") is a semi-independent

federal agency and is authorized to do business in Hawaii. The Agency

employed Plaintiff, and Plaintiff's office was located in the Agency's Honolulu,

Hawaii facility.

3.  Defendant's employees involved in the conduct described herein were, at all

times, employees, agents, or representatives of the Defendant and were at all

times acting in the course and scope of that employment. Accordingly,

Defendant is liable for such conduct under the doctrine of Respondeat Superior.

## **JURISDICTION**

4.  The Court has jurisdiction over the lawsuit because the suit arises under Title

VII of the Civil Rights Act of 1964 ("Title VII"), as codified, 42 U.S.C. §§

2000e to 2000e-17 and under the Age Discrimination in Employment Act of

1967 ("ADEA"), as codified, 29 U.S.C. §§ 621 to 634, including incorporated

provisions of the Fair Labor Standards Act, 29 U.S.C. §201 et seq.

2

**VENUE**

5.  Venue is proper in this district under 28 U.S.C. §1391(e)(1)(C) because the
    claim does not involve real property and Plaintiff resides in this district.

6.  Venue is also proper in this district under 28 U.S.C. §1391(e)(1)(B) because a
    substantial part of the events or omissions giving rise to the claim occurred in
    this district as Plaintiff's employment location was Honolulu, Hawaii.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

7.   On or about August 2018 through May 2019, Complainant filed ten formal
    claims of discrimination and/or retaliation against the Agency. The Agency
    issued its Final Agency Decision on November 8, 2019.  Complainant filed his
    Notice of Appeal on December 12, 2019.  The EEOC Office of Federal
    Operations ("EEOC") denied Plaintiff's appeal on August 16, 2021 and denied
    Plaintiff's request for reconsideration on January 31, 2022.

8.  Accordingly, Plaintiff files this complaint within 90 days after receiving a right
    to file a civil action from the Equal Employment Opportunity Commission
    Office of Federal Operations.  A copy of the Equal Employment Opportunity
    Commission Office of Federal Operations Decision on Request for
    Reconsideration is attached as Exhibit A.

## **GENERAL ALLEGATIONS**

9.   Plaintiff started his career as a postal assistant in 1972 and over the next 44

years worked his way up through the USPS ranks as a clerk, a carrier, a

supervisor mails and delivery, a manager stations and branches, a postal

operations analyst, a postal operations specialist, an industrial engineer senior,

a senior operations analyst, and manager in-plant support before becoming an

EAS-23 operations specialist.  In this progression, Plaintiff consistently

demonstrated his competence, knowledge, and ability to run all aspects of a

postal operation, including managing and supervising others.

10.  For nearly two decades, Plaintiff and his manager, Mr. Leo Tudela ("Mr.

Tudela") were the sole two USPS employees who worked in any meaningful

capacity with and in the Freely Associated States ("FAS") region.  The FAS is

comprised of independent countries: The Republic of the Marshall Islands, the

Federated States of Micronesia, and the Republic of Palau.  Pursuant to each of

these countries' Compact of Free Association with the United States, the USPS

provides mail service to and from the FAS with reimbursement by the United

States Congress.  The unique nature of the subject matter and the two-person

operation resulted in a very unique situation in the USPS where Mr. Tudela

and Plaintiff were the only two USPS personnel knowledgeable about postal

operations in the FAS remotely sufficient to oversee the FAS in any capacity.

11. Mr. Tudela retired from the Agency on or around March 30, 2018.  Because Mr. Tudela was incumbent only position, Freemont Rigel ("Rigel"), Executive Director International Strategy and Business Development Support, became Plaintiff's new supervisor upon Mr. Tudela's retirement.  On March 22, 2018, Rigel informed Plaintiff that as a start, Rigel had signed Plaintiff on an EAS-25 higher level assignment from March 31, 2018 to September 28, 2018 the last Friday of the 2018 fiscal year, but Rigel would talk more with Plaintiff before the end of the detail about a future permanent higher-level position.

12.  While on this EAS-25 detail, Plaintiff's position title was Manager New International Opportunities.  Plaintiff was never given a description of this position and was only instructed by Rigel that while on the detail, Plaintiff was to take over Mr. Tudela's Director Asia Pacific Relations responsibilities upon Mr. Tudela's retirement.

13.  Unbeknownst to Plaintiff and Mr. Tudela, Arneece Williams ("Williams"), an EAS-25 BIS/OFAC specialist, had been detailed into Mr. Tudela's Director Asia Pacific Relations position as the Acting Director Asia Pacific Relations on or around March 5, 2018.  Mr. Tudela was still actively working in the position through his retirement date of March 30, 2018, and Mr. Tudela was unaware that Williams had been detailed into his position.  Mr. Tudela's position was also an incumbent only position not available for detail.

Plaintiff's EAS-25 detail was given to perform the duties of the Director Asia Pacific Relations positions from the time Mr. Tudela retired.

14. In June 2018, a new V-02 level position in Global Business, the Manager International Policy and Business Development, was created that purportedly incorporated Mr. Tudela's former Director Asia Pacific Relations position's duties and responsibilities as Mr. Tudela's position was an incumbent only position.  All ten of the listed duties and responsibilities for the Manager International Policy and Business Development position applied to the Asia Pacific region and the FAS.  Four of those ten duties and responsibilities specifically list the FAS or FAS countries by name and an additional two duties and responsibilities specifically list the Asian Pacific Region.  This new position was internally posted from June 12, 2018 through June 27, 2018.  Per the terms of the vacancy announcement, all non-bargaining career Postal employees service-wide were eligible to apply for the position.  Rigel was the selecting official.

15.  Plaintiff applied to the Manager International Policy and Business Development position on June 26, 2018.  A three-person review committee was formed to evaluate the ten applications.  For each of the six qualifications and requirements listed on the Manager International Policy and Business Development vacancy announcement applicants were given a Knowledge

Skills and Abilities ("KSA") score of zero to three.  Any applicant who received a 0 score in any KSA requirement received a zero overall score for their application and were removed from further vacancy consideration. Requirement 3 was "Knowledge of the Asian Pacific Region at a level sufficient to oversee the development and evaluation of complex international business plans and policies that provide solutions to the strategic business needs of the Republic of Palau, the Federated States of Micronesia, and the Republic of the Marshall Islands."

16.  On July 9, 2018, the committee evaluated the applications. Six applicants received a zero score for Requirement 3.  Plaintiff received a three, Williams received a three, Joy Doby ("Doby") received a two, and Gary Ronald ("Ronald") received a one.  However, Ronald received a zero a different requirement and was removed from consideration.  From the review committee, only Plaintiff, Williams, and Doby received non-zero total scores. Plaintiff received the highest rating of eighteen, Williams also received an eighteen, and Doby received a twelve.

17. Plaintiff was the only applicant who did not know or list as a reference a member of the three-person review committee.  Unbeknownst to Plaintiff until he received the Agency's investigative file, Williams listed Cheri DeMoss ("DeMoss"), one of the three review committee members, as a reference on her

application.  DeMoss was one of the three review committee members.  Doby

listed Robert Graham, chairperson of the three-person review committee, as a

reference on her application.  Both Williams and Doby are African American

women and younger than Plaintiff.

18.  Rigel interviewed Plaintiff, Williams, and Doby on July 12, 2018.  Questions

Plaintiff was asked during the interview were: 1) tell me about the positions

you have held, 2) how would you handle a subordinate who was not doing

their job, 3) are you going to ask for a domicile if given this position, 4) in

your opinion, what is the most pressing issue facing the FAS, 5) tell me all you

know about the AED, 5) tell me all you know about the GDPR, and 7) do you

have any other questions.

19.  Rigel selected Williams on July 12, 2018. From the Agency's records, Rigel

asserted that he selected Williams over Plaintiff because Plaintiff did not have

any manager experience related to managing the work of others.  Rigel also

stated to the Agency investigator that he selected Williams based on his

perception that William's "legal background will be a big asset based on the

position's responsibilities" and that work on Advance Electronic Data

("AED") and General Data Protection Regulation ("GDPR") projects are part

of Manager International Policy and Business Development.  Neither the AED

nor the GDPR are listed as a duty and responsibility or as a qualification on the Manager International Policy and Business Development position.

20.  Plaintiff was amply qualified for the Manager International Policy and Business Development position, and his qualifications and experiences were plainly superior to the selectee, Williams.  In addition to Plaintiff's decades of experience with the FAS, Plaintiff had nearly twenty-nine years of experience in many other areas of postal operations and Plaintiff had nearly twelve years of experience managing the work others, including positions in which Plaintiff's title included "supervisor" or "manager", and an additional nearly sixteen years of managerial experience under the Mr. Tudela managing the seven FAS post offices and their postmasters.  Plaintiff also completed the USPS's Advanced Leadership Program ("ALP").  ALP is a USPS leadership development program for non-PCES employees who have been identified as potential successors for PCES executive positions.

21.  Although Rigel selected Williams for the Manager International Policy and Business Development position on July 12, 2018 and the effective date of her position was July 21, 2018, Plaintiff was unaware of Williams's selection until August 13, 2018 when Rigel's manager, Franca Davis ("Davis") announced William's selection by electronic letter to the Global Business Group.  Plaintiff was officially notified of his non-selection on September 5, 2018.

22.  A month after Rigel became aware of Plaintiff's EEO complaint, Rigel denied Plaintiff's continued EAS-25 detail.  Contrary to earlier conveyances, Rigel now claimed that Plaintiff's detail was only a short-term transition until the Manager International Policy and Business Development vacancy was filled.  However, William's detail predates Mr. Tudela's retirement and Plaintiff's EAS-25 detail.  Rigel selected Williams for the Manager International Policy and Business Development vacancy in July 2018.  Plaintiff, operating under what Rigel had told him about the justification for the EAS-25 detail, continued to do the work of the Director Asia Pacific Relations in the detail through the end of September 2018, two months after the vacancy was filled.

23.  On November 29, 2018, Plaintiff was approached by Anthony Alverno ("Alverno"), Chief Counsel for the USPS at a meeting in the Bolger Center, in Potomac, M.D., and told that Plaintiff was expected to work on a special Universal Postal Union ("UPU") project that is of the highest importance to the USPS.  The project that Plaintiff was expected to work on was to convince a FAS country, the Republic of Palau, to break the Compact of Free Association and become an international full member of the UPU for mail purposes.  Without membership in the UPU, the United States has no mechanism or agreement to send or receive international mail.

10

24.  Plaintiff advised Alverno that the work Plaintiff was being asked to do was

far beyond his EAS-23 position especially given that Plaintiff was not selected

for the Manager International Policy and Business Development position to

which the FAS responsibilities, particularly interacting with the FAS

governments, belong to.  Plaintiff also informed Alverno that Plaintiff had filed

an EEO and raised ethical concerns about Williams's selection to the Manager

International Policy and Business Development position.  Alverno informed

Plaintiff that Plaintiff should dismiss the complaint and "get over it" to put the

USPS first.

25.  On or around November 30, 2018, Rigel notified Michelle Lassiter

("Lassiter"), an EAS-25 Classification Specialist, that she would be detailed

into William's pay band V-02 level Manager International Policy and Business

Development position.  Plaintiff's qualifications were plainly superior to

Lassiter's.  Lassiter is a female and under age 40.  Lassiter was recommended

by Williams, but Rigel was the selecting and approving manager.  According

to Agency records, Lassiter's detail officially began on December 10, 2018.

Lassiter's detail consisted of work on the FAS and the UPU.

26.  Plaintiff was never informed that a detail to the position was available nor

was the detail opportunity posted or announced.  Thus, Defendant intentionally

precluded Plaintiff from expressing interest or applying for the detail.  Had

11

Plaintiff been aware that the detail existed, Plaintiff would have expressed interest in and applied for the detail.  Rigel and Williams should have reasonably known that Plaintiff would be interested in a detail to the position as Plaintiff had applied for the position mere months prior and had been actively engaged in protected activity regarding his non-selection.  Agency records show that Lassiter did not apply for the Manager International Policy and Business Development position when it was posted earlier that year.

27.  Williams and Rigel assert that Plaintiff was not considered for the detail because he was not at headquarters and had less exposure to the portfolio than Lassiter.  On the day Lassiter was selected, Plaintiff was actually in Washington, D.C. as he was attending USPS Headquarters meetings at the Bolger Center and USPS Headquarters that week.  Lassiter's official start date for the detail was more than a week later which would have provided Plaintiff ample time to be at Headquarters to start the detail.  For at least the fifteen years leading up to this selection, Plaintiff has been a USPS Headquarters employee and had worked with many Headquarters cross-functional groups, making him very familiar with the portfolio, especially the listed responsibilities of this particular position.  In contrast, Lassiter spent at least two-thirds of her detail "shadowing" the employees she was managing in her detail indicating Lassiter's unfamiliarity with the portfolio.

28.  In additional to all the FAS related work Lassiter, the Acting Manager International Policy and Business Development, was supposed to be doing, Plaintiff was then also required to do the UPU special project work on the UPU-FAS option, which Williams was on higher level detail to do.  In essence, management required Plaintiff to do the substantive work of three positions, two of which were higher levels than his own, at his regular EAS-23 compensation and despite not being selected for the higher-level Manager International Policy and Business Development.  When Plaintiff reported his concerns regarding working outside his current position, Lassiter issued Plaintiff a disciplinary letter.

29.  On January 23, 2019, the USPS had a series of telecons on the various UPU options.  Although the telecon was at 5am Plaintiff's time, Plaintiff was expected to attend.  The UPU FAS model team consisted of Williams as primary, Plaintiff as secondary, Lea Emerson, and Peter Chandler.  Williams, Emerson, and Chandler did not show up for the telecon, springing the meeting's responsibilities solely on Plaintiff.

30.  When asked to present his position, Plaintiff raised legitimate concerns about the Agency pursuing the FAS option.  Because Plaintiff was the only UPU FAS model team member who attended the telecon, Plaintiff sent a summary of his telecon comments to the remaining team members with a CC to his

13

supervisory staff, Lassiter, Rigel, and Robert Raines ("Raines") who was

filling in for Davis while Davis was on medical leave.

31.  Following the January 23, 2019 UPU teleconference, Lassiter became

increasingly hostile to Plaintiff, which made Plaintiff uncomfortable given that

Lassiter was his supervisor.  Plaintiff expressed on at least two occasions to

Lassiter that Plaintiff felt that Lassiter was hostile, threatening, and in

retaliation for Plaintiff engaging in protected activity.  One of those emails was

sent on Wednesday February 6, 2019.  Lassiter did not respond to Plaintiff's

emails but did leave Plaintiff a voice mail expressing her concern that Plaintiff

felt threatened.  Fearing further hostility and retaliation from Lassiter, Plaintiff

responded by email acknowledging receipt of Lassiter's voicemail and told

Lassiter that it would be best to let the investigators sort it out.

32.  Two working days after being informed of Plaintiff's protected activity,

Lassiter issued Plaintiff a disciplinary Letter of Warning ("LOW") on February

11, 2019 based on serious misconduct and complying only minimally with the

duties and of Plaintiff's position.  Plaintiff was surprised by the LOW because

Agency regulations require progressive discipline before issuing a LOW,

because he did not actually engage in serious misconduct as alleged, and

because Agency regulations do not permit issuing of a LOW for performing

the minimum duties of one's position.  Under Agency regulations, Plaintiff's

job performance would only subject him to discipline unless his performance is

repeatedly or consistently below the minimum requirements.  Plaintiff did not

have a pattern or a history of infractions or other "misconduct" as this LOW

was the first discipline Plaintiff was ever subjected to or accused of in his prior

44 years with the Agency.  USPS misconduct is investigated by the USPS

Office of Inspector General ("USPS OIG").  The USPS OIG includes a wide

list of criminal activity that qualifies as misconduct.  These include: Postal

Service employees' misuse of Postal Service computers, destruction or theft of

Postal Service property, falsification of official documents and forgery, theft of

funds, abuse of authority, sabotage of operations, narcotics use or sale of drugs

while on duty, and alcohol abuse.  Telling the truth and raising valid

operational concerns on a telecon do not constitute a one-off offense serious

enough to justify a LOW.

33. Plaintiff received Lassiter's LOW on February 14, 2019.  Pursuant to Agency

policy and Lassiter's direction in the LOW, Plaintiff timely exercised his right

to appeal the LOW sending his Step A Appeal to Lassiter February 21, 2019.

In his Step A Appeal, Plaintiff presented a very detailed rebuttal of every

assertion and basis Lassiter issued the LOW on.  Plaintiff also informed

Lassiter by email on February 22, 2019 that he had mailed the appeal and

15

provided Lassiter the tracking number.  Lassiter acknowledged receipt of that email on February 22, 2019.

34.  Plaintiff's Step A Appeal was delivered to Lassiter on February 26, 2019. Under Agency policy the supervisor who issued the LOW, was required to issue Plaintiff a written decision within 10 calendar days after she received the Step A Appeal.  10 calendar days ended on March 8, 2019.  After more than 20 days without any acknowledgment or response from Lassiter, Plaintiff wrote to Raines, Acting Managing Director Global Business, on March 19, 2019 asking Raines to review the Step A Appeal that Plaintiff submitted since Lassiter apparently had refused to do so.  Raines's letter was delivered on March 25, 2019.  Plaintiff wrote to Raines because Raines was the next lowest supervisor in Lassiter's supervisory staff who was not involved in Plaintiff's EEO case.

35.  Having still not heard from Lassiter and fearing only increased hostility for engaging in protected activity, Plaintiff sent Lassiter, Williams, Rigel, and Raines a letter dated March 26, 2019 that the actions of the USPS and Global Business Group have created a work environment so hostile, with no foreseeable expeditious resolution, that Plaintiff is forced to retire effective April 3, 2019 close of business.

36.  Unknown to Plaintiff at the time, Lassiter was removed from her detail to Manager International Policy and Business Development effective March 22,

16

2019.  Despite no longer being Plaintiff's supervisor, on March 27, 2019, Lassiter denied Plaintiff's Step A Appeal.  Lassiter denied Plaintiff's Step A Appeal not on the merit of his arguments presented in the Step A Appeal, but instead because Plaintiff did not apologize for his alleged misconduct or express remorse such that he would not do it again.  LOW Appeals are not dependent on the target of a LOW apologizing under Agency regulations.

37.  From the Agency's investigation, Plaintiff learned that Lassiter had contacted Agency EEO contract investigator, Thomas Anshutz ("Anshutz"), to confirm whether or not Plaintiff had engaged in protected activity.  Lassiter received confirmation that Plaintiff had engaged in protected activity from Anshutz on March 26, 2019.  The following day, March 27, 2019, Lassiter denied Plaintiff's Step A Appeal.  Plaintiff received Lassiter's Step A Appeal denial on April 2, 2019.  Seeing no other way out of the hostile work environment, Plaintiff retired on April 3, 2019.

38. In Lassiter's March 27, 2019 Step A Appeal denial, Lassiter informed Plaintiff that "[He] have the right to appeal this letter of warning as stated in section 652.43 of the Employee and Labor Relations Manual.  If [he] wish to do so, [he] must inform Freemont Rigel in writing within seven (7) calendar days of [his] receipt of this letter."  On April 2, 2019, the same day Plaintiff received Lassiter's Step A Appeal denial, Plaintiff sent Rigel notice that he would be

sending a Step B Appeal to Rigel. This notice was delivered on April 9, 2019. Plaintiff sent Rigel his Step B Appeal on April 8, 2019, and it was delivered to Rigel on April 12, 2019. Plaintiff's Step B Appeal contained a detailed narrative addressing multiple points of error as well as specific reasons why Lassiter's Step A Appeal denial was in error.

39. On April 15, 2019, Plaintiff received a letter from Rigel dated April 11, 2019 denying Plaintiff's Step B Appeal. However, Rigel would not receive Plaintiff's Step B Appeal until April 12, 2019. In Rigel's April 11, 2019 letter denying Plaintiff's Step B Appeal, Rigel referenced Plaintiff's filing of EEO complaints as a factor in Rigel's decision to uphold the LOW. Rigel then denied Plaintiff's Step B Appeal on his assumption that Plaintiff's Step B Appeal would be the same as his Step A Appeal. However, Plaintiff's actual Step B Appeal contained detailed arguments why Lassiter's Step A Appeal denial was improper and unsupported. These arguments could not have been included in Plaintiff's Step A Appeal as Plaintiff did not know Lassiter's reasons for denying the Step A Appeal until Lassiter issued the denial.

40. Rigel's preemptive denial left Plaintiff no choice but to request a review of Rigel's Step B Appeal denial to USPS Labor Relations on April 29, 2019. On May 15, 2019, William Farley, Headquarters ELM 650 Facilitator, denied Plaintiff's review request.

18

41.  Thus, Plaintiff's 44-year postal career was brought to a premature end by a nearly year-long period of discrimination, retaliation, and increasingly hostile work environment.

## CAUSES OF ACTION

## COUNT I
**Discrimination, Retaliation, Hostile Work Environment, and Constructive Retirement Based on Race in Violation of Title VII**

42.  Plaintiff repeats and realleges paragraphs 1 through 41 hereof, as if fully set forth herein.

43.  Plaintiff is an employee under the meaning of Title VII and belongs to a class protected under the statute, namely race-white.

44.  Defendant is an employer within the meaning of Title VII, is engaged in an industry affecting commerce, and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

45.  Defendant intentionally discriminated against Plaintiff because of his race in violation of Title VII when Plaintiff was not selected for the Manager International Policy and Business Development position in or around July/August 2018.

46. Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant ended Plaintiff's higher-level detail in September 2018.

47. Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant did not offer Plaintiff the opportunity to detail or select Plaintiff for the Acting Manager International Policy and Business Development detail position in December 2018.

48. Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant issued a Letter of Warning to Plaintiff in February 2019.

49. Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant denied Plaintiff's Step A Appeal of the Letter of Warning in March 2019.

50. Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant denied Plaintiff's Step B Appeal of the Letter of Warning in April 2019.

51. Defendant created a hostile work environment when Plaintiff had to do the duties and responsibilities of the positions of the Manager International Policy and Business Development and the Acting Manager International Policy and Business Development detail position despite his non-selection and his not

receiving additional pay.  When Plaintiff voiced his concerns to his supervisor, Williams, acting supervisor, Lassiter, higher-level manager, Rigel, or general counsel, Alverno, Plaintiff's concerns were ignored, gaslighted, or retaliated against.  This conduct was so severe that it altered the terms and conditions of Plaintiff's employment and created a hostile work environment.

52.  Defendant is liable for Williams's, Lassiter's, and Rigel's discriminatory conduct because Defendant's supervisory staff took tangible employment actions against Plaintiff that significantly Changed Plaintiff's employment and which culminated in Plaintiff's constructive retirement in April 2019.

## COUNT II
**Discrimination, Retaliation, Hostile Work Environment, and Constructive Retirement Based on Sex in Violation of Title VII**

53.  Plaintiff repeats and realleges paragraphs 1 through 41 hereof, as if fully set forth herein.

54.  Plaintiff is an employee under the meaning of Title VII and belongs to a class protected under the statute, namely sex-male.

55.  Defendant is an employer within the meaning of Title VII, is engaged in an industry affecting commerce, and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

56.  Defendant intentionally discriminated against Plaintiff because of his sex in violation of Title VII when Plaintiff was not selected for the Manager International Policy and Business Development position in or around July/August 2018.

57.  Defendant intentionally discriminated against Plaintiff because of his sex in violation of Title VII when Plaintiff was not selected for the Acting Manager International Policy and Business Development detail position in or around December 2018.

58.  Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant ended Plaintiff's higher-level detail in September 2018.

59.  Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant did not offer Plaintiff the opportunity to detail or select Plaintiff for the Acting Manager International Policy and Business Development detail position in December 2018.

60.  Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant issued a Letter of Warning to Plaintiff in February 2019.

61. Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant denied Plaintiff's Step A Appeal of the Letter of Warning in March 2019.

62. Defendant retaliated against Plaintiff because he engaged in protected activity in violation of Title VII when Defendant denied Plaintiff's Step B Appeal of the Letter of Warning in April 2019.

63. Defendant created a hostile work environment when Plaintiff had to do the duties and responsibilities of the positions of the Manager International Policy and Business Development and the Acting Manager International Policy and Business Development detail position despite his non-selection and his not receiving additional pay. When Plaintiff voiced his concerns to his supervisor, Williams, acting supervisor, Lassiter, higher-level manager, Rigel, or general counsel, Alverno, Plaintiff's concerns were ignored, gaslighted, or retaliated against. This conduct was so severe that it altered the terms and conditions of Plaintiff's employment and created a hostile work environment.

64. Defendant is liable for Williams's, Lassiter's, and Rigel's discriminatory conduct because Defendant's supervisory staff took tangible employment actions against Plaintiff that significantly Changed Plaintiff's employment and which culminated in Plaintiff's constructive retirement in April 2019.

## COUNT III

**Discrimination, Retaliation, Hostile Work Environment, and Constructive Retirement Based on Age in Violation of the ADEA**

65. Plaintiff repeats and realleges paragraphs 1 through 41 hereof, as if fully set forth herein.

66.  Plaintiff is an employee within the meaning of the ADEA and belongs to the class of employees protected under the statute, namely, employees over the age of 40.

67.  Defendant is an employer within the meaning of the ADEA, is engaged in an industry affecting commerce, and has 20 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

68.  Defendant intentionally discriminated against Plaintiff because of his age in violation of the ADEA when Plaintiff was not selected for the Manager International Policy and Business Development position in or around July/August 2018.

69.  Defendant intentionally discriminated against Plaintiff because of his age in violation of the ADEA when Plaintiff was not selected for the Acting Manager International Policy and Business Development detail position in or around December 2018.

70.  Defendant retaliated against Plaintiff because he engaged in protected activity in violation of the ADEA when Defendant ended Plaintiff's higher-level detail in September 2018.

71.  Defendant retaliated against Plaintiff because he engaged in protected activity in violation of the ADEA when Defendant did not offer Plaintiff the opportunity to detail or select Plaintiff for the Acting Manager International Policy and Business Development detail position in December 2018.

72.  Defendant retaliated against Plaintiff because he engaged in protected activity in violation of the ADEA when Defendant issued a Letter of Warning to Plaintiff in February 2019.

73.  Defendant retaliated against Plaintiff because he engaged in protected activity in violation of the ADEA when Defendant denied Plaintiff's Step A Appeal of the Letter of Warning in March 2019.

74.  Defendant retaliated against Plaintiff because he engaged in protected activity in violation of the ADEA when Defendant denied Plaintiff's Step B Appeal of the Letter of Warning in April 2019.

75.  Defendant created a hostile work environment when Plaintiff had to do the duties and responsibilities of the positions of the Manager International Policy and Business Development and the Acting Manager International Policy and Business Development detail position despite his non-selection and his not

receiving additional pay.  When Plaintiff voiced his concerns to his supervisor, Williams, acting supervisor, Lassiter, higher-level manager, Rigel, or general counsel, Alverno, Plaintiff's concerns were ignored, gaslighted, or retaliated against.  This conduct was so severe that it altered the terms and conditions of Plaintiff's employment and created a hostile work environment.

76.  Defendant is liable for Williams's, Lassiter's, and Rigel's discriminatory conduct because Defendant's supervisory staff took tangible employment actions against Plaintiff that significantly Changed Plaintiff's employment and which culminated in Plaintiff's constructive retirement in April 2019.

## DAMAGES

77.  As a direct and proximate result of Defendant's conduct, Plaintiff suffered the following damages:

    A.  Plaintiff was denied a promotion to the Manager International Policy and Business Development position, resulting in lost pay and other benefits as well as mental anguish and emotional distress.

    B.  Defendant ended Plaintiff's higher-level detail as Manger New International Opportunities, resulting in lost pay and other benefits as well as mental anguish and emotional distress.

    C.  Plaintiff was denied a higher-level detail to the Acting Manager International Policy and Business Development position, resulting in

lost pay and other benefits as well as mental anguish and emotional distress.

D. Defendant retaliated against Plaintiff through the issuance of the Letter of Warning and denying Plaintiff's Step A and B appeals, resulting in mental anguish and emotional distress.

E. Plaintiff was constructively discharged from employment with Defendant approximately 12 years earlier than Plaintiff intended to retire, resulting in lost pay and other benefits as well as mental anguish and emotional distress.

## ATTORNEY'S FEES & COSTS

78. Plaintiff is entitled to an award of attorney fees and costs under Title VII, 42 U.S.C. §2000e-5(k).

## PRAYER

WHEREFORE, Plaintiff, RANDALL F. SOBOL, prays for judgment on the Complaint as follows:

A. That this Court accept jurisdiction over this matter;

B. That this Court find in favor of Plaintiff and against Defendant;

C. That this Court award Plaintiff compensatory damages, including, but not limited to, past and future pecuniary damages and non-pecuniary damages, in an amount to be proven at trial;

D. That this Court award Plaintiff reinstatement or front pay in lieu of reinstatement, and back pay with interest, in an amount to be proven at trial;

E. That this Court order and award Plaintiff equitable relief as provided by statute;

F. That this Court award Plaintiff his costs and reasonable attorney's fees incurred in connection with this action as provided by statute; and

G. That this Court grant such additional or alternative and further relief as the Court deems just and proper.

DATED: April 15, 2022, at Honolulu, Hawaii

Respectfully Submitted,

By    /s/ Jennifer A.M.S. Coburn
      JENNIFER A.M.S. COBURN

      Attorney for Plaintiff
      RANDALL F. SOBOL

28