IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| RANDALL F. SOBOL,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>LOUIS DEJOY, POSTMASTER GENERAL, UNITED STATES POSTAL SERVICE,<br><br>　　　　　Defendant. | Civil No. 22-00170 MWJS-RT<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Randall Sobol, a White man over the age of sixty, challenges the United States Postal Service's decision to select a Black woman in her late forties for a manager role instead of him.  According to Sobol, that decision and the subsequent fallout violated two federal civil rights statutes—Title VII and the Age Discrimination in Employment Act.  He sued his former employer on claims of discrimination, retaliation, hostile work environment, and constructive discharge.

The Postal Service now moves for summary judgment on all claims.  As the Court concludes that there is no genuine dispute of material fact and that the Postal Service is entitled to judgment as a matter of law, it GRANTS the motion.

# BACKGROUND

## A.    The Selection Decision

Sobol was a career employee of the Postal Service.[1]  For his final seventeen years there, Sobol worked as an operations specialist in the Global Business Group.  ECF No. 44, at PageID.208 (Def.'s Concise Statement of Facts (CSF) ¶ 3).  In that role, Sobol supported the Director of Asia-Pacific Relations, a man named Leo Tudela, who oversaw the Postal Service's operations in three island nations:  the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau, collectively known as the Freely Associated States (FAS).  *See id.* (¶¶ 1, 3).  Because of this experience, Sobol was recognized as a subject matter expert on the FAS.  *Id.* (¶ 3).

From its inception, Tudela's director position was designated "incumbent only," meaning that it would not be filled once vacant.  ECF No. 44-1, at PageID.216 (Freemont Rigel Decl. ¶ 5).  Hence, when Tudela retired in March 2018, the Postal Service folded Tudela's responsibilities into a new position:  the Manager of International Policy and Business Development.  ECF No. 44, at PageID.208 (Def.'s CSF ¶ 2).  The Manager would "[m]anage[] and provide[]

---

[1]    The named defendant in this case is Postmaster General Louis DeJoy, who is sued in his official capacity.  Because this official-capacity suit is effectively a suit against the Postal Service, and because DeJoy himself plays no role in the case's facts, this Order refers to the Postal Service as the defendant for clarity.

guidance to USPS leadership on international mail policies and programs that impact the flow of international mail." ECF No. 49-4, at PageID.842 (job posting). Like Tudela's director position, the new Manager would be responsible for supervision of operations in and international relations with the FAS. *Id.* at PageID.843. According to the Postal Service, the Manager would also have a broader policy portfolio, requiring knowledge of advanced electronic data and the European Union's General Data Protection Regulation (GDPR), among other things. ECF No. 44-1, at PageID.217 (Rigel Decl. ¶ 6). The Manager position would be stationed in Washington, D.C. *Id.*

Sobol applied to fill this new position. At the first step in the selection process, a three-person review committee scored each applicant based on their perceived fit for the job's knowledge, skill, and ability requirements. ECF No. 44-16, at PageID.515 (evaluation matrix). The committee gave two applicants, Sobol and Arneece Williams, a perfect eighteen-out-of-eighteen score. *Id.* A third applicant, Joy Doby, received a twelve out of eighteen. *Id.* The committee selected these three applicants to proceed to the interview stage. ECF No. 44, at PageID.209 (Def.'s CSF ¶ 7). Sobol is a White man, and Williams and Doby are Black women. *Id.* At the time of the selection process, Sobol was over sixty years old and both Williams and Doby were over forty. *Id.*; ECF No. 49-2, at PageID.820 (Sobol Decl. ¶ 2).

3

Their applications were passed along to Freemont Rigel, the then-Executive Director of International Strategy and Business Development Support and, for purposes of the Manager position, the selecting official. ECF No. 44-1, at PageID.215 (Rigel Decl. ¶ 3); *id.* at PageID.219 (¶ 15). Rigel interviewed the applicants in July 2018. ECF No. 49-2, at PageID.826-27 (Sobol Decl. ¶¶ 19-20). He asked the same questions of each of them, touching on their experience with managing subordinates, with the FAS, with the GDPR, and with advanced electronic data, among other things. *Id.* at PageID.827 (¶ 20); ECF No. 44-1, at PageID.222 (Rigel Decl. ¶ 21).

Rigel selected Williams for the job, and central to this case is whether that decision was a discriminatory one. Rigel claims—and Sobol disputes—that Williams was the most qualified applicant for the position. ECF No. 44, at PageID.209 (Def.'s CSF ¶ 8); ECF No. 49, at PageID.810 (Pl.'s CSF ¶ 8). According to Rigel, Williams possessed both "managerial experience" and "vast experience with the international and global business divisions." ECF No. 44-1, at PageID.222 (Rigel Decl. ¶ 22). She had, for example, experience with advanced electronic data and the GDPR. ECF No. 44, at PageID.209 (Def.'s CSF ¶ 8); ECF No. 49, at PageID.810 (Pl.'s CSF ¶ 8). And Rigel believed that Williams's training as an attorney would serve her well as she reviewed agreements and regulations. ECF No. 44-1, at PageID.222 (Rigel Decl. ¶ 22). To Rigel, Williams "stood out

. . . immediately as far more qualified for the Manager position than the other two candidates." *Id.*

That is not to say that Sobol was wholly unimpressive. Rigel recognized Sobol's subject matter expertise in the FAS. *Id.* at PageID.223 (¶ 23). But according to Rigel, in the interview, Sobol was "dismissive" of other topics, like more general international issues and his management experience. *Id.* Furthermore, Rigel was familiar with Sobol's job responsibilities, and he believed that Sobol's only real management experience, from roughly fifteen years prior, was too distant to be relevant. *Id.* at PageID.223-24 (¶ 24).

Sobol largely rejects this characterization of his qualifications and his interview performance. Throughout his career with the Postal Service, Sobol held several positions in which, he says, he supervised subordinates. *See* ECF No. 49-2, at PageID.821-23 (Sobol Decl. ¶¶ 4-8) (describing prior positions). He also states that in the interviews, Rigel said that Sobol's answers to questions about advanced electronic data and the GDPR were "spot on." *Id.* at PageID.827 (¶ 21). And because of Sobol's extensive experience with the FAS, he claims that Williams's qualifications must have paled in comparison. *See id.* at PageID.828 (¶ 22). The fix was in from the beginning, Sobol says, because the day before the interview and against Sobol's objection, Rigel required him to brief Williams on FAS-related issues. *Id.* at PageID.826-27 (¶ 19).

Williams's selection was formally announced on August 13, 2018.  ECF No. 44-11, at PageID.327.  That same day, Sobol contacted the Postal Service's equal employment opportunity hotline.  ECF No. 49-2, at PageID.828 (Sobol Decl. ¶ 24).  He officially lodged a complaint on September 17, 2018.  *Id.* at PageID.829 (¶ 24).

**B.    The Details**

At the time of Williams's selection, Sobol was on detail as Manager of New International Opportunities, a higher-level role than his operations specialist position.  ECF No. 44, at PageID.208 (Def.'s CSF ¶ 4).  In this detail, Sobol says that he assumed Tudela's duties and responsibilities.  ECF No. 49-2, at PageID.826 (Sobol Decl. ¶ 15).  The detail was temporary—scheduled to last from March 2018 to September 2018—and, according to Rigel, intended to help with the transition after Tudela's retirement.  ECF No. 44, at PageID.208 (Def.'s CSF ¶ 4); ECF No. 44-1, at PageID.218 (Rigel Decl. ¶ 11).  In an email to Sobol, Rigel expressed his "intent to submit justification for a permanent EAS-25 Domiciled position"—in other words, to create a permanent higher-level position for Sobol.  ECF No. 44-8, at PageID.270.

But that permanent position never materialized.  And although Sobol requested an extension, his detail ended as originally planned—just over a month after Williams was selected as Manager, and less than two weeks after Sobol filed his formal complaint—and Sobol returned to his operations specialist role.  ECF

No. 44, at PageID.210 (Def.'s CSF ¶ 11); ECF No. 44-18, at PageID.531.  Over email, Rigel encouraged Sobol to apply for permanent higher-level positions in the future.  ECF No. 44-18, at PageID.531.

Meanwhile, major policy changes were afoot at the Postal Service.  The then-presidential administration had unexpectedly announced its intent to withdraw from the Universal Postal Union, the organization governing international mail service.  ECF No. 44, at PageID.210 (Def.'s CSF ¶ 13).  Williams—who had just been selected as Manager—was tapped to help coordinate the Postal Service's response.  *Id.*  To fill the sudden vacancy, Rigel needed to quickly detail someone into the Manager position.  *Id.*

He selected Michelle Lassiter as Acting Manager.  *Id.* (¶ 15).  According to Rigel, Lassiter was a natural candidate:  she had experience with export issues, she was already a higher-level employee, she had previously worked with Rigel, she had Williams's endorsement, and critically, she was already working at Postal Service headquarters in Washington, D.C.  ECF No. 44-1, at PageID.226 (Rigel Decl. ¶ 33).  Rigel states that he never considered Sobol for this detail, as he lived in Honolulu, lacked the necessary management skills and international experience, and was in a lower-level position.  *Id.* (¶ 34).  Upon assuming the detail, Lassiter became Sobol's direct supervisor.  ECF No. 44, at PageID.210 (Def.'s CSF ¶ 16).

7

## C.     The Conference Call and Fallout

On January 23, 2019, Lassiter convened a conference call with Postal Service employees to discuss potential exit strategies from the Universal Postal Union.  ECF No. 44-3, at PageID.248-49 (Lassiter Decl. ¶ 14).  Sobol was among the participants, invited to discuss the withdrawal's impact on mail service to the FAS.  *See id.*  Williams had a conflict and could not attend.  *Id.* (¶ 15).

On the call, Lassiter turned things over to Sobol to discuss his involvement with a particular policy proposal.[2]  Sobol said that Williams "should be on here" because she "[wa]s now the point person."  "Anything further," Sobol stated, "should really be addressed to her, not me."  Sobol proceeded to explain the history of Tudela's retirement, the creation of the Manager position, and Williams's ultimate selection.  Because Williams "d[id] not have the knowledge or the experience in the FAS," Sobol believed he was "being expected to quietly feed information so [that] she can present it on her own and legitimize [Rigel]'s selection."  He said that he had "told many people at headquarters over the last six months that actions have consequences."  Williams's "true level of FAS

---

[2]     The following description of the January 23, 2019, conference call is drawn from an audio recording of the call.  Because it contains sensitive policy discussions, the Court granted a motion to file that recording under seal and directed the Postal Service to file a trimmed version for public access.  ECF No. 63.  All portions of the recording discussed in this Order are in the publicly available version of that recording.

knowledge and experience and relationships—or lack thereof—is what the USPS has in the FAS now."  Sobol continued, "I'm done doing the work of her position and my position, and I'm tired of doing the work—you know—of a position that I was not selected for, so that the person who was—"

Lassiter attempted to interject:  "Okay, Randy."  But Sobol cut her off:  "No, I-I-I'm gonna continue on."

Although the parties do not meaningfully dispute the substance of the call, they disagree over how to characterize it.  Sobol says that he "presented legitimate concerns" that one proposed strategy "would fail" because of Williams's "inexperience" with the FAS.  ECF No. 49-2, at PageID.833 (Sobol Decl. ¶ 31). He "also expressed [his] concern" that this proposed strategy "exploited the Republic of Palau," and he "described by allegory how [his] situation was like the intended exploitation of Palau."  *Id.*

Lassiter saw things differently.  "When it was time for Mr. Sobol to contribute," Lassiter recalls, he instead "disparaged Ms. Williams'[s] qualifications and stated that since she was promoted over him despite her lack of experience, participants should not expect him to answer their questions."  ECF No. 44-3, at PageID.249 (Lassiter Decl. ¶ 15).  Lassiter attempted to interrupt him, "but he spoke over [her] and said he would finish his thoughts."  *Id.*  This "outburst completely derailed the conversation," *id.* at PageID.250 (¶ 15), and, according to

Lassiter, "was unprofessional, unwarranted, and not in line with acceptable conduct at the Postal Service," *id.* (¶ 17).

Sobol sent an email after the call, summarizing his remarks.  He discussed the delicate relationship between the Postal Service and the FAS.  ECF No. 44-11, at PageID.335.  But he also "address[ed] the elephant in the room":  Williams "just does not have the knowledge or experience in the FAS."  *Id.*  "I'm tired of doing the work of the position that I was not selected for," Sobol wrote, "so that the person who was selected can appear to know what she's doing."  *Id.* at PageID.336.

From there, things continued to sour.  On a team call the following week, Lassiter previewed that she wanted "to get a better understanding of [Sobol's] day-to-day work as it related to the FAS compact agreements."  ECF No. 44-3, at PageID.251 (Lassiter Decl. ¶ 20).  Sobol followed up by email, writing that:

> Rather than me teaching you, I think it is best you talk to the legal department because these are essentially contracts.  Alternatively, I suggest you speak to [Williams] as this falls under the purview and [knowledge, skills, and abilities] of the Manager, International Policy and Business Development position for which I was not selected for.  The person in that position should be sufficiently well versed to teach you.

ECF No. 44-11, at PageID.337 (February 1, 2019, email).

Lassiter replied that she "d[idn't] need [Sobol] to explain the agreements to [her]."  *Id.* at PageID.341 (February 4, 2019, email).  Instead, she "need[ed] to

become familiar with [Sobol's] workload, just as [she had] been spending time with other team members to become familiar with their workloads." *Id.*  And she reminded Sobol that, "as the subject matter expert for the FAS," he had "the responsibility to share information with [her] as [his] acting manager." *Id.*

Sobol responded, thanking Lassiter "for the clarification and rebuke." *Id.* at PageID.338.  He included a lengthy written description of his workload. *See id.* at PageID.338-41.  But he also told Lassiter that she had "missed the point." *Id.* at PageID.338.  He "ha[d] no idea why everyone" kept saying that he was the subject matter expert "as if it is some sort of consolation prize." *Id.*  It was Williams, by virtue of her new position, who was the subject matter expert. *Id.*  Sobol thanked Lassiter for "confirming that it is [his] role and [his] responsibility to feed (sorry, 'share') information about the FAS higher up." *Id.*  Sobol concluded that Lassiter had exposed her "true colors," as he "felt the tone and the content" of her "email to be hostile, threatening of adverse action, and written in anger and in retaliation related to [his] engagement in protected activity." *Id.* at PageID.341.

## D.    Disciplinary Action

Lassiter issued a letter of warning to Sobol.  ECF No. 44-30, at PageID.564 (letter of warning dated February 11, 2019).  Lassiter wrote that the letter was justified because of the January 23 teleconference and Sobol's subsequent "willingness to comply only minimally with the duties of [his] position." *Id.*

Lassiter added that she hoped the warning would convey "the seriousness of [his] misconduct and that it is critical that it not continue." *Id.*

Sobol timely appealed the letter directly to Lassiter, the first step in the Postal Service's internal appeals process. *See* ECF No. 44-11, at PageID.280-417 (appeals letter and attachments). When Lassiter did not issue a written response within the ten days prescribed by agency policy, Sobol wrote Robert Raines, the Acting Managing Director of Global Business, to inform him of the inaction. ECF No. 49-2, at PageID.836 (Sobol Decl. ¶ 35). That letter was delivered on March 25, 2019. *Id.* The very next day, "having not heard from Lassiter and fearing further increased hostility for engaging in protected activity," Sobol tendered notice of his imminent resignation. *Id.* at PageID.836-37 (¶ 36). He attributed his resignation to a "work environment so hostile, with no foreseeable expeditious resolution." ECF No. 44-33, at PageID.573 (resignation letter). He would retire upon return from sick leave, on April 3, 2019. *Id.*

The day after Sobol announced his resignation, Lassiter upheld the letter of warning. ECF No. 44-34, at PageID.575. She "remain[ed] concerned" that Sobol had not recognized his unprofessionalism in the conference call, and she stressed that her requests had fallen squarely within the duties and responsibilities of Sobol's operations specialist position. *Id.* at PageID.575-76. Their interactions, Lassiter said, "were nothing more than routine business engagement between a

manager and direct report." *Id.* at PageID.575.  Lassiter also explained the reasons

for the delay in her response:  after receiving the 138-page appeal, she had been

concerned that some of the attached documents "might contain sensitive

information pertaining to the protected action [Sobol had] mentioned in previous

emails." *Id.*  For that reason, Lassiter had asked the Postal Service's legal

department to redact any sensitive information. *Id.*  That review process, Lassiter

said, delayed her consideration of Sobol's appeal. *Id.*

On April 3, 2019, Sobol's resignation took effect.  By this point, Robert

Raines—Rigel's supervisor—had received Sobol's letter that complained of

Lassiter's slow response.  ECF No. 44-37, at PageID.593.  Raines referred the

letter to Rigel for review. *Id.*  Rigel construed that letter as an additional appeal by

Sobol, and on April 11, 2019, he upheld the letter of warning.[3] *Id.*  Rigel noted

that Sobol "believe[d] that the decision not to select [him] was based on a

discriminatory reason." *Id.* at PageID.594.  And Rigel recognized that Sobol had

---

[3]     Sobol takes issue with this timing.  He mailed Rigel his official appeal—in
which Sobol says that Lassiter wrongly denied his initial appeal because she
"live[s] in some kind of sick fantasy land where no one but Lassiter apparently
knows the truth," ECF No. 49-17, at PageID.1044—on April 8, 2019, and it
arrived on April 12.  ECF No. 49-2, at PageID.838 (¶ 39).  But Rigel's decision
was dated April 11, the day *before* Rigel received Sobol's actual appeal. *Id.*
Rigel's appeal decision, however, explains this discrepancy.  Rigel had construed
the letter that Sobol had previously sent to Raines (and which Raines had
forwarded to Rigel) as the appeal, for it complained about Lassiter's initial review
of the letter of warning.  ECF No. 44-37, at PageID.593.

"appropriately pursued [his] rights" by filing a complaint.  *Id.*  But Rigel

nevertheless concluded that the letter of warning had been warranted, because

Sobol "still took the opportunity to express [his] displeasure in a way that was

inappropriate on the conference call."  *Id.*  Because Sobol was now retired from an

"otherwise unblemished 44-year career," Rigel decided not to place the letter of

warning in Sobol's official file.  *Id.*

Sobol, by now retired for over three weeks, appealed Rigel's decision.  ECF

No. 44-38, at PageID.596-651 (appeal letter dated April 29, 2019).  Because of his

retirement, however, the appeal was deemed moot.  ECF No. 44-39, at PageID.653

(letter dated May 15, 2019).

All the while, the Postal Service had investigated Sobol's formal complaint

and found no discrimination.  ECF No. 1-3, at PageID.33.  Sobol appealed that

decision to the Equal Employment Opportunity Commission, which affirmed the

finding of no discrimination.  *Id.*  After denying a request for reconsideration, the

Commission informed Sobol that he had ninety days to file a civil action.  *Id.*

### E.    This Motion for Summary Judgment

Sobol brought this action on April 15, 2022.  He presses claims of

discrimination, retaliation, hostile work environment, and constructive discharge in

violation of Title VII and the Age Discrimination in Employment Act (ADEA).

14

The Postal Service now seeks summary judgment.  It argues that there is no genuine dispute of material fact that the Postal Service's conduct complied with Title VII and the ADEA.

The Court held a hearing on the motion for summary judgment on May 23, 2024.  ECF No. 60.  The Court thanks the parties for their helpful briefing and effective oral advocacy.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when a moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To prevail, the movant must demonstrate the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When the moving party will not have the burden of proof at trial—like the Postal Service in this case—it must do more than simply "deny[] the allegations in the opponent's pleadings" or "assert[] that the nonmovant lacks evidence to support its claim."  10A Charles A. Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2727.1 (4th ed. 2016).  Instead, the movant must "produce evidence negating an essential element of the nonmoving party's claim" or "show that the nonmoving party does not have enough evidence of an

essential element to carry its ultimate burden" at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party makes that showing, the burden then shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).  This burden "is not a heavy one," as "the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."  *Dark v. Curry County*, 451 F.3d 1078, 1082 n.2 (9th Cir. 2006) (internal quotation marks omitted).

When considering a motion for summary judgment, the Court must view the facts and draw inferences in favor of the nonmoving party.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  Questions of credibility, moreover, must be reserved for the jury.  *Id.* at 630.

## DISCUSSION

Sobol advances claims of discrimination, retaliation, hostile work environment, and constructive discharge.  The Court considers the Postal Service's motion for summary judgment claim by claim, analyzing each under Title VII and the ADEA.

//

//

16

### A.      Discrimination

Sobol argues that two of the Postal Service's actions were discriminatory: first, the selection of Williams for the Manager position, and second, the selection of Lassiter as Acting Manager.  ECF No. 1, at PageID.19-26 (¶¶ 45, 56, 57, 68, 69).  He argues that these actions violate both Title VII, which prohibits employment discrimination based on race and sex, 42 U.S.C. § 2000e-16, and the ADEA, which forbids employment discrimination on the basis of age, 29 U.S.C. § 633a.

A burden-shifting framework applies to Sobol's discrimination claims under both Title VII and the ADEA.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) (applying burden-shifting framework to Title VII); *Shelley v. Geren*, 666 F.3d 599, 607-08 (9th Cir. 2012) (holding that the same framework applies to ADEA claims).  At the first step of this framework, Sobol must establish a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If Sobol makes that showing, the Postal Service must articulate a "legitimate, nondiscriminatory reason" for its actions.  *Id.*  And if the Postal Service does so, Sobol must offer evidence that the stated reasons were pretext for discrimination. *Id.* at 804.

//

//

### 1.    Prima Facie Case

Sobol bears the initial burden of establishing a prima facie case.  To do so under a failure-to-select theory for Title VII, Sobol must show (1) he is a member of a protected class, (2) he applied for and was qualified for the position that he was denied, (3) he was rejected despite his qualifications, and (4) the Postal Service filled the position with an employee not of Sobol's race or sex. *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005). The prima facie case under the ADEA is similar:  the plaintiff must show that (1) he was at least forty years old, (2) he was qualified for the position, (3) he was denied the position, and (4) the promotion was given to a substantially younger person.  *Shelley*, 666 F.3d at 608.  An age gap of ten or more years is presumptively substantial.  *France v. Johnson*, 795 F.3d 1170, 1174 (9th Cir. 2015).  At the summary judgment stage, the proof needed to establish a prima facie case is "minimal."  *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)); *see also Gerdom v. Continental Airlines, Inc.*, 692 F.2d 602, 608 (9th Cir. 1982) (initial burden "is not onerous").

Sobol has met his "minimal" burden with respect to the permanent Manager position, but not with respect to the Acting Manager detail.  Begin with the Manager position.  First, Title VII affords all people protection against

discrimination on the basis of their race or sex, and the ADEA protects all persons over forty from age discrimination.  Both protect Sobol, a White man over sixty.  Second, Sobol was minimally qualified for the position, as the three-person review committee assigned Sobol a perfect eighteen-out-of-eighteen score based on his fit for the position's knowledge, skill, and ability requirements.  Next, despite his qualifications, Sobol was rejected.  And finally, the selected employee (Williams) was of a different race (Black), a different sex (female), and more than ten years younger (late forties).

The Postal Service does not dispute most of Sobol's prima facie case, but it argues that this stage of the analysis requires a more thorough weighing of Sobol's qualifications against Williams's.  ECF No. 43-1, at PageID.195-96 (citing *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004)).  Generally, however, "objective job qualifications"—like, for example, a minimum number of years of experience—"are best treated" at the prima facie stage, whereas "subjective criteria, along with any supporting evidence, are best treated at the later stages" of the burden-shifting framework.  *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1344 (9th Cir. 1981); *Ross v. Brooks Coll.*, 339 F. App'x 749, 750 (9th Cir. 2009) ("[Plaintiff] was not required to show that [the other applicant] lacked superior qualifications to establish a prima facie case.").  Here, the fact that the three-person review committee deemed Sobol

19

qualified is enough to satisfy the qualification element of Sobol's prima facie case. The Court will therefore consider the Postal Service's other qualification arguments at the pretext stage, not the prima facie stage. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1159 (9th Cir. 2010); *see also Lynn*, 656 F.2d at 1344-45 (noting that even though it is "preferable" to treat qualification evidence at a later step of the analysis, "it should make little difference to the outcome which way the evidence is analyzed").

Sobol does not, however, offer sufficient evidence to establish a prima facie case that Rigel's failure to consider him for the Acting Manager detail was discriminatory.[4]  The detail was not a permanent position with an open selection process but a three-and-a-half-month stint to fill a sudden vacancy.  One of the detail's requirements was that the Acting Manager reside in Washington, D.C.  *See* ECF No. 44-1, at PageID.226 (Rigel Decl. ¶¶ 33-34).  Sobol was never considered for the detail "because he was in Honolulu, not Headquarters." *Id.* (¶ 34).  Sobol nevertheless claims that he was physically in Washington, D.C., for a meeting on the very day that Lassiter was selected for the detail.  And Sobol says that, had he been asked, he would have been willing to move.  But the fact remains that Sobol lived in Honolulu.  Because Sobol did not satisfy a basic requirement of this detail,

---

[4]   Because Rigel selected Lassiter, a White woman, for the Acting Manager detail, Sobol does not advance a race discrimination claim as to this selection decision.

he has not established a prima facie case that the decision to not select him for the

Acting Manager detail was discriminatory.

### 2.    Legitimate Nondiscriminatory Reason

Although Sobol has not made out a prima facie case for the Acting Manager

detail, he has established a prima facie case for the permanent Manager position.

Accordingly, as to that latter position, the burden shifts to the Postal Service to

offer a legitimate nondiscriminatory reason for its selection decision.

It has done so.  The Postal Service contends that Williams was the more

qualified candidate for the Manager position.  Rigel, the selecting official, offered

several reasons why he considered Williams the most qualified candidate:  her

experience and record with the international and global business divisions, her

familiarity with advanced electronic data and the GDPR, her management

experience, and her legal background.  ECF No. 44, at PageID.209 (Def.'s CSF

¶ 8); ECF No. 49, at PageID.810 (Pl.'s CSF ¶ 8); ECF No. 44-1, at PageID.222

(Rigel Decl. ¶ 22).  Rigel also said that, in the interviews, "Williams stood out to

[him] immediately as far more qualified for the Manager position than the other

two candidates."  ECF No. 44-1, at PageID.222 (Rigel Decl. ¶ 22).

By contrast, in his interview, Sobol "was dismissive and deflected" on

questions about recent management experience and international issues outside of

the FAS.  *Id.* at PageID.223 (¶ 23).  Moreover, because he was Sobol's second-

level manager, Rigel "knew the reality of [Sobol's] job responsibilities," and he "knew that [Sobol] was not at the level this promotion required." *Id.* (¶ 24). Williams, according to Rigel, was "the best candidate and would best serve the needs of the organization." *Id.* (¶ 22). This explanation satisfies the Postal Service's burden. *Dominguez-Curry*, 424 F.3d at 1037 (finding employer's burden satisfied by claim that selected employee was "the more qualified candidate").

### 3.   Pretext

As the Postal Service has offered a legitimate rationale for its selection decision, the burden returns to Sobol to demonstrate pretext. He may do so by offering direct or circumstantial evidence. Sobol admits that he lacks direct evidence, such as an employer's "clearly sexist, racist, or similarly discriminatory statements or actions." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).

To nevertheless demonstrate pretext, Sobol must show by circumstantial evidence that "the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981). Put differently, Sobol must offer "sufficient evidence to find that the employer's asserted justification is false." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). Generally, "very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive," as "any indication of discriminatory motive"

can be enough to send a case to a jury.  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) (cleaned up).  But employers are entitled to some discretion in the selection process, and the mere fact that an "employer misjudged the qualifications of the applicants does not in itself" mean that the decision was motivated by discrimination.  *Burdine*, 450 U.S. at 259; *see also Cotton v. City of Alameda*, 812 F.2d 1245, 1249 (9th Cir. 1987) ("The ADEA does not make it unlawful for an employer to do a poor job of selecting employees.").  And simply pointing to irregularities in the selection process will not overcome a motion for summary judgment unless those irregularities suggest that the employer's "stated reasons for not hiring [the plaintiff] were pretextual."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1286 (9th Cir. 2000) (citing *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990)); *see, e.g.*, *Franett-Fergus v. Omak Sch. Dist. 19*, 743 F. App'x 855, 858 (9th Cir. 2018) ("[T]he fact that [the employer's] practices differed from . . . experience" by relying on a requirement "not listed on the job posting" does "not suggest that [the employer's] proffered reasons were false.").

Sobol adduces circumstantial evidence that, he claims, undercuts the Postal Service's credibility, creates an inference of discrimination, and requires this case be submitted to a jury.  His arguments fall into three categories.  First, he suggests that Rigel was lying about the position requirements and responsibilities.  Second, Sobol contends that he was objectively more qualified for the position than

23

Williams.  And third, Sobol points to specific actions that he believes demonstrate bias during the selection process.  The Court therefore must consider whether this evidence creates a genuine question as to the credibility of the Postal Service's stated rationale for selecting Williams.  *Cotton*, 812 F.2d at 1249.

> a.      **The Position Requirements and Responsibilities**

Begin by considering the job's requirements and responsibilities.  When he learned of Tudela's planned retirement, Rigel started developing a new position. ECF No. 44-1, at PageID.217 (Rigel Decl. ¶ 6).  As Rigel explained at the time, he was "mandated to work thr[ough] HR to re-purpose [the position] . . . and to incorporate additional requirements."  ECF No. 44-6, at PageID.265 (July 2018 email from Rigel to Sobol); ECF No. 44-8, at PageID.270 (April 2018 email from Rigel to Sobol, saying "our plan is to re-purpose the manager role (for new work we have been assigned)").  So he did just that.  In consultation with human resources, Rigel changed the position's pay classification, added direct reports, relocated the position to join the rest of the Global Business Group in Washington, D.C., and—most importantly for this case—expanded the position's policy portfolio.  ECF No. 44-1, at PageID.217 (Rigel Decl. ¶ 6).  The position was no longer "limited to" the FAS.  *Id.* (¶ 7).  It was instead "meant to be broader, requiring a wider range of knowledge and managerial skills."  *Id.*

Rigel thought it imperative for the position's scope to widen.  Since Tudela assumed his position in 1997, the needs of the Postal Service had evolved.  ECF No. 49-27, at PageID.1129.  In Rigel's opinion, "had [the position's] duties been limited to FAS it would not have been approved" because "[t]he Postal Service no longer needed multiple people devoted to that one subject area."  ECF No. 44-1, at PageID.218 (Rigel Decl. ¶ 8).  "[W]hat was needed was a manager who could deal with and manage multiple components of the Global Business portfolio simultaneously."  *Id.*

The job posting reflected this broadened scope.  The stated purpose of the role was to "[m]anage[] and provide[] guidance to USPS leadership on international mail policies and programs that impact the flow of international mail."  ECF No. 44-11, at PageID.324.  This would include a "focus on service improvements" in "foreign regions," the "development of new package business opportunities," and the "exploration" of "alliance opportunities."  *Id.*

The job posting identified ten specific duties and responsibilities.  Of them, four mentioned the FAS:  the Manager would be responsible for operational issues, program evaluations, international relations, and intergovernmental coordination for the FAS.  *Id.* at PageID.325.  Two other descriptions focused on initiatives in the Asian Pacific region.  *Id.*  The remaining responsibilities were broader:  the Manager would have to "provide[] information to external stakeholders," maintain

"effective working relationships with other government agencies to ensure" that Postal Service policies "conform to overall U.S. government policies," manage "communication and transfer of best practices" between different offices within the Postal Service, and "[m]anage[] a small professional staff." *Id.*

The job posting also included six knowledge, skill, and ability requirements. One was knowledge of the Asia Pacific region, which included the FAS. *Id.* The other five were communication abilities, management abilities, knowledge of international business principles and strategies, the ability to manage activities and agreements regarding global networks, and the ability to cultivate working relationships with stakeholders. *Id.*

Rigel explains that some of these requirements were expansive by design. Human resources, Rigel says, advised him to use general language so that the job posting could encompass the Postal Service's evolving needs. ECF No. 44-1, at PageID.220-21 (Rigel Decl. ¶ 17). For example, in 2018, the requirement to have "[k]nowledge of international business principles and strategies" would have included knowledge about advanced electronic data and the GDPR, both of which were important topics when the position was first posted. *Id.* at PageID.221 (¶ 17). In short, the new Manager position was "charged with management of multiple areas and the persons that service them"—the FAS were "just one component of the new role." *Id.* at PageID.216 (¶ 5).

26

Sobol sharply disagrees.  He says that the job posting made clear that the "Manager Position was FAS and Asia-Pacific focused."  ECF No. 48, at PageID.799.  Sobol also argues that Rigel required experience with advanced electronic data and the GDPR, yet those requirements were nowhere mentioned in the job posting.  *Id.*  The gap between the job posting and Rigel's own selection criteria, so goes Sobol's argument, is evidence of pretext.

For purposes of Sobol's discrimination claims, the relevant question is whether a reasonable juror, presented with Sobol's evidence, could find that Rigel's rationale for selecting Williams for the position—that she was the most qualified—is "unworthy of credence."  *Burdine*, 450 U.S. at 256.  A reasonable juror could not so find.

Sobol offers no evidence to suggest that the Postal Service's description of the position was inconsistent with the position's *actual* responsibilities.  To the contrary, the evidence suggests that the Manager position did, in fact, have a broad range of duties, the FAS being just one of them.  *See, e.g.*, ECF No. 44-2, at PageID.237 (Williams Decl. ¶ 15) (explaining that her duties as Manager included the GDPR, Universal Postal Union, International Post Corporation, advanced electronic data, customs, product questions, bilateral agreements, and the FAS, in addition to managing her team's daily work); ECF No. 44-3, at PageID.247

(Lassiter Decl. ¶ 10) (similar); ECF No. 44-8, at PageID.270 (April 2, 2018, email from Rigel to Sobol, describing Williams's broad duties in her Manager detail).

The job posting itself also comports with Rigel's description of the position. The high-level description of the position discusses "international mail policies and programs"—it does not mention either the FAS or the Asian Pacific region. *See* ECF No. 44-11, at PageID.324 (job posting). That broad framework readily supports Rigel's description of the position as a manager who would possess a broad, international portfolio. Moreover, as Sobol himself recognizes, hiring decisions at the Postal Service are based on the knowledge, skill, and ability requirements, not the position's duties and responsibilities. *See* ECF No. 48, at PageID.783. And only one of the six requirements even mentioned the FAS.

Sobol insists that the emphasis on advanced electronic data and the GDPR was improper, for they are not explicitly listed in the job posting. While it is true that they are not directly mentioned, they fit comfortably within the requirement for "[k]nowledge of international business principles and strategies." ECF No. 44-11, at PageID.325. Logically, this requirement must incorporate specific business principles and strategies, like advanced electronic data and the GDPR; to read this requirement as *not* incorporating specific principles and strategies would be to read it out of the job posting entirely. Moreover, when Sobol applied for the Manager position, he understood that it entailed more than just FAS knowledge; Sobol

28

admits that, in advance of the interview, he consulted with someone at Postal
Service headquarters "on the [advanced electronic data] and GDPR programs
based on what [they] had heard from Headquarters meetings."  ECF No. 49-2, at
PageID.827 (Sobol Decl. ¶ 21).

Accordingly, the most that can be said of Sobol's argument is that the job
posting did not perfectly encapsulate the duties of the position.  But there is no
dispute that the position required everything that Rigel said it did:  management
experience, fluency with international issues, knowledge of advanced electronic
data and the GDPR, and familiarity with the FAS.  Given the lack of a dispute as to
the duties of the Manager position, a reasonable juror could not find that Rigel's
description of the job requirements was somehow pretext for discrimination.

### b.    Sobol's Qualifications

The second of Sobol's three pretext arguments is that he was more qualified
for the position.  He claims that his FAS knowledge clearly exceeded Williams's,
that he had substantial management experience that Rigel overlooked, and that
Rigel inappropriately considered Williams's legal degree and her experience with
advanced electronic data and the GDPR.

"[Q]ualifications evidence may suffice, at least in some circumstances, to
show pretext." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).  The plaintiff's
qualifications, however, must be "clearly superior" to those of the selected

candidate.  *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1492 (9th Cir. 1995).

Standing alone, the "fact that a court may think that the employer misjudged the

qualifications of the applicants" does not mean that the employer acted

discriminatorily, although it may be "probative."  *Burdine*, 450 U.S. at 259.

 Critically for this case, employers are not required to only consider objective

qualifications listed in a job posting.  "Many criteria for higher level jobs are not

easily articulable," and the reliance on "subjective employment criteria" can be

appropriate.  *Casillas v. U.S. Navy*, 735 F.2d 338, 345 (9th Cir. 1984).  The

question is not whether the "best w[as] selected"—it is whether "the selection

process w[as] free from impermissible discrimination."  *Id.* at 344.

 On this evidence, a reasonable juror could not find that Sobol's

qualifications were clearly superior to Williams's.  With respect to the FAS, Sobol

contends that he was by far the more qualified candidate, and the Postal Service

recognizes that Sobol was a subject matter expert on the FAS.  ECF No. 44, at

PageID.208 (Def.'s CSF ¶ 3); *see also* ECF No. 44-1, at PageID.223 (Rigel Decl.

¶ 23).

 The Postal Service points out, however, that Williams also had FAS

experience.  Throughout her time with the Postal Service, Williams repeatedly

worked on FAS issues.  She helped with FAS compacts as an attorney contractor

with the Postal Service's legal department, she prepared business need statements

and price change documents regarding the FAS, and she was the designated point person for advice on customs in the FAS.  ECF No. 44-2, at PageID.232-33 (Williams Decl. ¶ 7).  Immediately prior to being selected for it, Williams detailed into the Manager position and performed the role's substantive duties which included, among other things, handling issues with the FAS.  ECF No. 44-14, at PageID.475.  Aware of this experience, the three-person review committee gave Williams an "excellent" score for the FAS-knowledge requirement.  ECF No. 44-16, at PageID.515 (evaluation matrix); ECF No. 44-12, at PageID.429.  Accordingly, even assuming that Sobol was more qualified on this specific metric, a reasonable juror, presented with this evidentiary record, could not conclude that Williams lacked knowledge of the FAS.

Sobol also highlights his decades of management experience, which he suggests was wrongfully overlooked.  In his application, Sobol said that "the first twenty years of [his] career" were in "the traditional operations environment," where he "directed the work of [his] staff's daily assignments and monitored the work of [his] staff."  ECF No. 49-8, at PageID.865.  In the early 1980s, Sobol spent two years as a supervisor at the Wahiawa Post Office, where he scheduled employees, approved leave, and reviewed attendance records.  *Id.* at PageID.858.  From 1993 to 2002, as the manager of in-plant support, Sobol managed "a very small size group of operations specialists," *id.* at PageID.856, handling their

scheduling, performance reviews, and assignments, ECF No. 49-2, at PageID.822-23 (Sobol Decl. ¶ 7).  In various operational and engineering positions, Sobol says that he scheduled hundreds of employees, sat on promotion boards, and helped with selection.  *Id.* at PageID.821-22 (Sobol Decl. ¶¶ 5, 6).  And Sobol claims that, from 2002 until 2018 as the operations specialist under Tudela, he was the "defacto operational manager of the FAS Post Offices," as he planned, organized, directed, and monitored the employees of the FAS offices.  ECF No. 49-8, at PageID.865; *see also* ECF No. 49-2, at PageID.824-25 (Sobol Decl. ¶ 12) (describing his "management work" as conducting an intermediate review of security clearance applications).

Rigel viewed Sobol's experience as an imperfect fit for the Manager position.  Because he "ha[d] known Mr. Sobol for years" as Sobol's "second level manager," Rigel "knew the reality of his job responsibilities" working under Tudela.  ECF No. 44-1, at PageID.223 (Rigel Decl. ¶ 24).  And for the fifteen years Sobol was in that job, Sobol "did not assign tasks, manage [employees'] workload, approve leave, or influence decisions regarding hiring, firing, and promoting."  *Id.* at PageID.224 (¶ 24).  Those types of tasks would be critical for the Manager role, which would have several direct reports.  For that reason, Rigel viewed Sobol's experience from pre-2002 as "too distant to be applicable."  *Id.*

A reasonable factfinder could not conclude that Rigel's assessment was pretextual. A selecting official who has had "the opportunity to observe" an employee may base a promotion decision on that personal knowledge. *Merrick*, 892 F.2d at 1438. Rigel, who had personally worked with Sobol and was familiar with his job responsibilities, believed that Sobol's management experience was not the right fit for the job. That cannot be considered discriminatory. Moreover, a reasonable juror could not find that it was pretextual for the Postal Service to place a premium on *recent* management experience. *Cotton*, 812 F.2d at 1249 ("We will not second guess the selection criterion used by an employer unless that criterion itself has a disparate impact on the protected class.").

By contrast, Rigel explains, Williams had recent, high-level management experience that would be useful for supervising direct reports as Manager. ECF No. 44-1, at PageID.222 (Rigel Decl. ¶ 22). According to her application, Williams spent about three years on director or manager details. *See* ECF No. 44-14, at PageID.475-77 (Williams's application). From 2013 to 2015, she had four or five direct reports as an acting director. ECF No. 44-2, at PageID.234 (Williams Decl. ¶ 8). For six months as an acting manager, she managed two employees and directed seven to eight contractors. *Id.* at PageID.235 (¶ 10). In another detail, Williams managed two employees for approximately three months. *Id.* at PageID.236 (¶ 12). As a specialist from 2015 to 2016, Williams also led a group

of several contractors, even though she was not officially a manager.  *Id.* at
PageID.235 (¶ 9); ECF No. 44-14, at PageID.476 (Williams's application).  And
finally, while on a detail in the Manager role itself, Williams managed two
employees and directed teams of contractors.  ECF No. 44-2, at PageID.236-37
(Williams Decl. ¶ 13).

Sobol points out that Williams's management experience was from "short-
term acting details."  ECF No. 48, at PageID.799.  That may be true, but the
technical classification of these positions does not undermine the fact that Williams
obtained valuable management experience from them, nor does Sobol claim that it
should.

Williams also had experience with advanced electronic data and the GDPR.
Sobol says that, while "Williams could very well be an expert" in these topics, they
were not included as part of the Manager's knowledge, skill, and ability
requirements.  *Id.*  But as discussed above, these topics are captured by the
requirement for "[k]nowledge of international business principles and strategies."
ECF No. 44-11, at PageID.325.  In any event, it is appropriate for an employer to
consider relevant attributes that are not explicitly mentioned in the job description.
*See, e.g.*, *Merrick*, 892 F.2d at 1439 (upholding summary judgment for an
employer, even though it relied on certain experience that was "not even
mentioned in the . . . job description").  And at the hearing, counsel for Sobol

34

acknowledged that the Postal Service was permitted to consider things other than what was listed in the posting's knowledge, skill, and ability requirements, so long as those extra qualifications are not given more weight than the listed requirements.  Even accepting this argument, a reasonable factfinder could not conclude that the advanced electronic data and GDPR were given *more* weight than knowledge of the FAS and management experience.

Williams also had a legal background, which Rigel believed would come in handy because the Manager "would be reviewing and analyzing agreements and regulations."  ECF No. 44-1, at PageID.222 (Rigel Decl. ¶ 22).  Sobol, however, says that the position had no educational requirement, and if advanced degrees were considered, his master's degree in systems management with a specialty in logistics would be relevant.  ECF No. 48, at PageID.800.  But reviewing agreements fits into the job posting's six requirements, which included the "[a]bility to manage . . . bilateral and multilateral agreements."  ECF No. 44-11, at PageID.325.  By comparison, the job posting's six requirements did not include operations and logistics expertise.  Moreover, Sobol does not challenge Rigel's explanation that legal training would, in fact, be useful for the Manager to have.  Accordingly, a reasonable juror could not conclude that it was discriminatory for an employer to value Williams's legal degree when that degree would equip her with relevant skills.

Recall how Sobol must prove pretext:  he must offer evidence that the Postal Service's reason for selecting Williams is "unworthy of credence" and "false." *Reeves*, 530 U.S. at 147.  He has not done so on the basis of his allegedly "clearly superior" qualifications.  The Postal Service explained that Williams was selected because of her management experience, legal background, fluency with international issues, and knowledge of advanced electronic data and the GDPR. ECF No. 44, at PageID.209 (Def.'s CSF ¶ 8); ECF No. 49, at PageID.810 (Pl.'s CSF ¶ 8).  The Postal Service recognized Sobol's expertise in the FAS, but it concluded that he lacked the relevant management experience to succeed in the role.[5]  The Postal Service may be incorrect in that assessment—perhaps Sobol would have been the better choice—but Sobol has adduced no evidence to discredit the Postal Service's explanation.

Indeed, Sobol admits that Rigel believed Williams was the more qualified candidate.  *Compare* ECF No. 44, at PageID.209 (Def.'s CSF ¶ 8) (identifying

---

[5]      In his brief, Sobol suggests that the Postal Service's rationale for its decision has shifted.  Originally, Sobol says, the Postal Service's explanation was that Sobol "did not have *any* manager experience related to . . . managing the work of others." ECF No. 48, at PageID.798.  Now, Sobol says, the explanation is that his "management experience was too distant." *Id.*  While shifting explanations can sometimes be evidence of pretext, *see, e.g.*, *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997), Sobol offers no evidence of what he claims was the Postal Service's original rationale.  And in any event, it is unclear that these two explanations—that a candidate lacked management experience and that the candidate's management experience was too distant—are materially different.

reasons why Rigel chose Williams for the position), *with* ECF No. 49, at

PageID.810 (Pl.'s CSF ¶ 8) ("Not [d]isputed as to Rigel's subjective beliefs.").

And so long as Rigel genuinely believed that Williams was the more qualified

candidate for the position, there is no "inference of discrimination." *Coleman*, 232

F.3d at 1286 (discussing *Merrick*, 892 F.2d 1434, and recognizing that if a plaintiff

"introduces no evidence that the company's stated reasons for not hiring him were

pretextual," there is "no inference of discrimination," even if the plaintiff offers

evidence that he "may have been more qualified in some respects").

### c.      Other Alleged Irregularities

Sobol's third category of argument is a catchall:  he identifies two other

irregularities in the selection process that, he claims, create a genuine dispute as to

the existence of pretext.

The first inconsistency that Sobol identifies is about one of Williams's

details.  According to the Postal Service, Williams detailed into the Manager

position while the selection process for that position was still underway.  ECF No.

44-1, at PageID.219 (Rigel Decl. ¶ 14); ECF No. 44-14, at PageID.475 (Williams's

application, listing "Director, Asia-Pacific Relations" from March 5, 2018 to

present).[6]  Sobol, however, claims that the detail never happened.  ECF No. 48, at

---

[6]      On her resume, Williams lists the detail as acting "Director, Asia-Pacific
Relations," while Rigel says that she filled the Manager position.  *Compare* ECF

PageID.799; ECF No. 49, at PageID.812 (Pl.'s CSF ¶ 30). He points to the internal

assignment order, which indicates that Williams detailed in a *different* role for

shorter time. ECF No. 49-24, at PageID.1124 (assignment order for Williams to

detail into Manager of Business Solutions & Tech Support from May 7, 2018, to

September 30, 2018).

The Postal Service, for its part, does not dispute that Williams was

nominally in a different role. *See* ECF No. 52, at PageID.1193 (Def.'s Further

CSF ¶ 30). But it insists that this was purely an administrative matter while the

Manager position was being created; Williams, according to the Postal Service,

still performed the substantive work of the Manager position. That explanation

carries weight, for as it turns out, Sobol *himself* claims that he detailed into a

position with a title that did not match its responsibilities. The official title of

Sobol's detail was "Manager [of] New International Opportunities." ECF No. 49-

2, at PageID.826 (Sobol Decl. ¶ 15). Despite that title, Sobol says that he

---

No. 44-14, at PageID.475 (Williams's resume), *with* ECF No. 44-1, at PageID.219
(Rigel Decl. ¶ 14). This difference in nomenclature—Director versus Manager—
appears to be purely semantic. Although Williams identifies the role as "Director,"
her resume describes broader duties consistent with those of the Manager position,
like managing a team associated with "the Universal Postal Union; Possessions,
Territories, and [the FAS]; as well as European Marketplace governance, strategies
and alliances." ECF No. 44-14, at PageID.475 (Williams's resume).

"performed all the duties and responsibilities of Mr. Tudela's Director Position."
*Id.* (¶ 14).[7]

The evidence shows that Williams was similarly performing the duties of one role while being formally assigned to another.  *See, e.g.*, ECF No. 44-8, at PageID.270 (April 2, 2018, email from Rigel to Sobol, saying "we have asked [Williams] to lead GDPR, facilitate all Global OIG/GAO inquiries, [International Post Corporation], assist with the Micronesia concerns, etc. . . ."); ECF No. 44-6, at PageID.265 (July 10, 2018, email from Rigel to Sobol, explaining that Williams was "the lead" on "strategies dealing with GDPR, [advanced electronic data], and also closely monitor[ing] the FAS situation").  Sobol never disputes this, nor can he:  he worked directly with Williams while she was on her detail.  ECF No. 44-2, at PageID.237 (Williams Decl. ¶ 13) ("Mr. Sobol and I corresponded often during [the detail] . . . .").  And even with the benefit of that firsthand knowledge, Sobol never contends that Williams did not do the substantive work of the Manager

---

[7]    Rigel disagrees with Sobol's characterization of his responsibilities.  Rigel says that Sobol, while on detail, "did not perform all the duties of the former Director position" but rather continued in his operations specialist role and "assisted with the transition after Mr. Tudela's retirement."  ECF No. 51-2, at PageID.1188 (Rigel Suppl. Decl. ¶ 5).  Assuming for the sake of argument that Rigel's description is true, the formal title of the detail position—Manager of New International Opportunities—would still not perfectly align with Sobol's actual responsibilities.  Indeed, it would appear that Sobol was in a "Manager" position despite having no direct reports.

position.  Accordingly, there is no genuine dispute that Williams performed the substantive duties of the Manager role while on her detail.

Sobol alleges one final irregularity:  Rigel required him to brief Williams on the FAS the day before the interview.  ECF No. 49-2, at PageID.826-27 (Sobol Decl. ¶ 19).  When Sobol asked to postpone the meeting until after the Manager position was filled, Rigel stated that the meeting "will have no bearing on questions asked at [the] interview" and that the FAS were "only one aspect of the new role."  ECF No. 49-25, at PageID.1125.  Rigel said the "[m]eeting need[ed] to proceed."  *Id.*; *see also* ECF No. 52, at PageID.1193 (Def.'s Further CSF ¶ 31) (not disputing that Sobol was required to brief Williams the day before the interviews).

Again, the relevant question is whether a reasonable factfinder could conclude that this meeting tends to suggest that Rigel's rationale for selecting Williams was "unworthy of credence."  *Burdine*, 450 U.S. at 256.  A reasonable factfinder could not reach that conclusion.  Rigel was both the selecting official and the interviewing official.  Had he wanted to choose Williams over Sobol, he would not have needed to prepare Williams for an interview that Rigel himself would be conducting and evaluating.  Moreover, it was Williams who reached out about the meeting.  ECF No. 49-2, at PageID.826-27 (Sobol Decl. ¶ 19).  At the time, Williams was on detail in the Manager position, and part of Williams's portfolio was the FAS.  To perform her duties, she would have been in

conversation with Sobol.  *See* ECF No. 44-2, at PageID.237 (Williams Decl. ¶ 13) ("Mr. Sobol and I corresponded often during this time on FAS-related issues . . . ."); ECF No. 44-8, at PageID.270 (April 2, 2018, email from Rigel to Sobol, noting that Williams "will be in contact (as applicable to your area of expertise)"). Sobol does not allege the contents of this meeting, nor does he claim that it gave Williams an unfair advantage in the interview.

Under certain facts, a similar situation might be more concerning.  For instance, if the three-person review committee had interviewed the candidates before assigning their numerical scores, and if Rigel had ordered Sobol to brief Williams in advance of that interview, it might appear that Rigel had unfairly intervened to benefit Williams.  But that is not this case.  And with the evidence that Sobol has offered, a reasonable juror could not conclude that Rigel's stated rationale for selecting Williams was pretextual, simply because Rigel asked for a meeting to proceed.[8]

---

[8]    Sobol also claims that the Postal Service said Williams's residence in Washington, D.C., made her more qualified for the Manager position.  ECF No. 48, at PageID.800.  But that is not one of the Postal Service's arguments regarding the permanent Manager position.  *See* ECF No. 44, at PageID.209 (Def.'s CSF ¶ 8) (listing reasons for selecting Williams; location not among them).  Sobol also claims that "Rigel has a statistical track record of hiring and promoting younger, female, and/or minority subordinates."  ECF No. 49-2, at PageID.828 (Sobol Decl. ¶ 23).  Yet the only support Sobol offers for this claim is the assertion that, sometime after Sobol's retirement, Rigel detailed two younger, minority women into his position.  *Id.* at PageID.829-30 (¶ 26).  He does not provide any allegations

It is useful to remember what Sobol does *not* dispute.  He says that the job posting emphasized the FAS.  But he does not dispute that the Manager position required more than just FAS knowledge.  Sobol says that he was more qualified for the position than Williams.  But he does not dispute that Rigel did, in fact, believe that Williams was the more qualified candidate.  *See* ECF No. 49, at PageID.810 (Pl.'s CSF ¶ 8).  Sobol says that Williams's detail form does not indicate that she detailed into the Manager position.  But he does not dispute that she substantively did the work of the Manager role while on her detail.

Sometimes, employers make decisions that their employees disagree with.  But that disagreement does not mean the decisions are discriminatory.  Here, none of Sobol's evidence, considered independently or collectively, creates a genuine dispute as to whether the Postal Service's reason for selecting Williams over Sobol—that she was the most qualified candidate—was somehow pretext for discrimination.  Absent such a showing, Sobol has not met his burden.  Accordingly, the Postal Service's motion for summary judgment as to the discrimination claims under Title VII and the ADEA is GRANTED.

---

about other applicants, their qualifications, or even if these two employees were the only people detailed into the role.  Absent such evidence, this conclusory statement cannot support an inference of discrimination.

**B.     Retaliation**

Sobol also argues that the Postal Service retaliated against him for filing his complaint with the Equal Opportunity Office.  The same three-step burden-shifting framework applies to claims of retaliation:  Sobol must establish a prima facie case for retaliation, the Postal Service must respond with a nondiscriminatory reason for its actions, and Sobol must then offer evidence that its reason is pretext for discrimination.  *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065-66 (9th Cir. 2003), *as amended* (Jan. 6, 2004).

1.  To have a prima facie case for retaliation, a plaintiff must show that (1) they engaged in a protected activity, (2) they suffered an adverse employment action, and (3) the protected conduct was a but-for cause of the alleged adverse action.  *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013); *Poland v. Chertoff*, 494 F.3d 1174, 1179-80 & n.1 (9th Cir. 2007) (same for ADEA).  The parties here agree that Sobol engaged in a protected activity when he filed his complaint.  They also agree that Sobol identifies five adverse employment actions:  the end of his detail, the decision not to create a permanent higher-level position for him, the decision not to consider him for the

//

//

//

43

Acting Manager detail, the issuance of the letter of warning, and the denial of his appeal of his letter of warning.[9]

The prima facie case, then, turns on causation. As Sobol correctly argues, temporal proximity between the protected activity and the adverse employment action, coupled with evidence that the official knew about the protected activity, can support an inference of causation that satisfies the prima facie case. *See Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986); *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003).

Sobol fails to show temporal proximity for one of the adverse actions. From its inception in March 2018, Sobol's detail was scheduled to end in September. Sobol did not contact the equal employment opportunity hotline until August, five months after starting the detail. By then, the Postal Service "had already decided upon a course of action adverse" to Sobol, *Miller*, 797 F.2d at 731 n.1, defeating the prima facie claim based on the end of Sobol's detail.

---

[9]     The Court therefore assumes that these actions are adverse employment actions for purposes of Title VII and ADEA retaliation claims. That is not, however, eminently clear: for example, Sobol's letter of warning was upheld *after* Sobol retired from the Postal Service, and there were no attendant consequences. The parties have not briefed, so the Court does not decide, whether this is an "adverse employment action" that "is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1237 (9th Cir. 2000).

The four other actions, however, all occurred within months of Sobol's protected activity.  And the Postal Service does not dispute that Rigel and Lassiter knew about Sobol's complaint when they committed the allegedly retaliatory acts.  Accordingly, Sobol makes out his prima facie case for retaliation as to those actions.

2.  In response, the Postal Service has offered legitimate, nondiscriminatory reasons for the four remaining adverse actions.  It first explains that the Acting Manager detail was a short-term position that required the candidate to be in Washington, D.C.—because Sobol resided in Honolulu, he was not considered for the role.  Second, Rigel says that he did not create a permanent higher-level position for Sobol because of "the evolving needs of the Postal Service, the state of current events, and [the] budget."  ECF No. 51-2, at PageID.1188 (Rigel Suppl. Decl. ¶ 5).  Third, Lassiter issued the letter of warning, according to the Postal Service, because Sobol's conduct in the teleconference was unprofessional and disruptive.  And finally, for the same reasons, both Lassiter and Rigel upheld the letter of warning.

3.  At the final stage of the burden-shifting framework, Sobol must show that the Postal Service's rationales for the four remaining adverse actions were pretextual.

Sobol says that the failure to consider him for the Acting Manager detail was pretext for retaliation because he was physically in Washington, D.C., on the day that Lassiter was selected and because he had more FAS experience than her.  But as discussed above, Sobol did not reside in Washington, D.C., and he thus fell short of a basic requirement of this detail.  A reasonable factfinder could therefore not conclude that Rigel's selection of Lassiter for this position was retaliatory.

As to Rigel's failure to establish a permanent higher-level position for him, Sobol contends that such a position was created *after* his retirement.  ECF No. 48, at PageID.803.  That means, Sobol suggests, that Rigel was denying him the position out of retaliation.  But as the Postal Service points out, Sobol offers no admissible evidence that such a position was, in fact, created.  And even if it was, Sobol does not allege when the position was created.

Sobol also concedes that this position was never promised or guaranteed.  Rather, Sobol asserts that Rigel stated he would "pursu[e] a higher-level position for [him]."  ECF No. 49-2, at PageID.825 (Sobol Decl. ¶ 24); *see also* ECF No. 51-2, at PageID.1188 (Rigel Suppl. Decl. ¶ 5) ("I intended to seek the creation of a permanent EAS-25 position for Mr. Sobol . . . .").  The evidence suggests—and Sobol does not dispute—that Rigel tried to pursue such a position but was stymied by organizational needs and budgetary issues.  With the evidence that Sobol has

provided, a reasonable juror could not find that it was retaliatory for the Postal Service to not create a brand-new, higher-level position for Sobol.

The final two adverse actions—the issuance of the letter of warning and the upholding of the letter on appeal—are the core of Sobol's retaliation arguments. The Court first considers Lassiter's decision to issue the letter. According to Sobol, the letter was issued in violation of established protocols and regulations, for his conduct was not sufficiently serious or frequent to justify a warning under the Postal Service regulations. *See* ECF No. 48, at PageID.803-04. Lassiter also did not offer progressive discipline, which Sobol says the regulations require. *Id.* at PageID.804. And Sobol asserts in his brief that another employee was only issued a letter of warning after *months* of unexcused absences from work and progressive discipline; by comparison, Sobol's conduct was undeserving of reprimand. *Id.*

For starters, and as the Postal Service points out, *see* ECF No. 51, at PageID.1175, Sobol offers insufficient evidence about this other employee. At the hearing, Sobol's counsel directed the Court to an affidavit that was completed by Rigel as part of the investigation into Sobol's complaint. In it, Rigel indicates that he upheld one other letter of warning for a man named Alfaro Rodriguez. ECF No. 49-11, at PageID.984. But this affidavit has no information about Rodriguez, his conduct, his letter of warning, the circumstances surrounding his appeal, or other

consequences he faced.  Without more information, Rodriguez cannot be a

comparator.  And in any event, what would be most relevant for Sobol's argument

is evidence of an employee who acted similarly and yet faced no repercussions—

Sobol does not allege that any such employee exists.

Setting that aside, there is no genuine dispute that Sobol's letter of warning

comported with Postal Service policies.  True, a letter of warning can sometimes

be "warranted by the failure of nondisciplinary corrective measures."  ECF No. 44-

29, at PageID.561.  But progressive discipline is not required—a letter may *also* be

warranted "by the seriousness of the offense."  *Id.*

Lassiter considered Sobol's conduct on the conference call and his behavior

afterwards sufficiently serious.  ECF No. 44-30, at PageID.564 ("It is my hope that

this letter of warning will impress upon you the seriousness of your misconduct

. . . .").  On the conference call, Sobol shared some germane comments.  But he

also took the opportunity to insist that Williams "d[id] not have the knowledge or

the experience in the FAS," that Sobol was "being expected to quietly feed

information" to her to "legitimize [Rigel]'s selection," and that he was "tired of

doing the work . . . of a position that [he] was not selected for."  When Lassiter

tried to redirect the conversation ("Okay, Randy—"), Sobol cut her off ("No, I-I-

I'm gonna continue on.").

48

Shortly after the call, Sobol memorialized his comments in a follow-up email, writing that "[a]nything further should be addressed to [Williams], not me." ECF No. 44-26, at PageID.553.  Sobol said that he "told many people at headquarters" that "actions have consequences," and Williams's "lack" of relevant experience "is what the USPS has for the FAS.  Plain and simple."  *Id.*  He concluded by saying that he was "done doing the work of her position and mine." *Id.*

As Lassiter explained in the letter of warning, since that incident, Sobol "demonstrated a willingness to comply only minimally with the duties of [his] position."  ECF No. 44-30, at PageID.564.  Indeed, in subsequent emails, Sobol evaded Lassiter's questions.  *See, e.g.*, ECF No. 44-11, at PageID.337 (February 1, 2019, email from Sobol to Lassiter, writing "Rather than me teaching you, I think it is best you talk to the legal department [about the FAS compacts]. . . . Alternatively, I suggest you speak to [Williams] as this falls under the purview [of the] . . . position for which I was not selected for."); *id.* at PageID.338 (February 6, 2019, email from Sobol to Lassiter, saying that his "role is not the FAS subject matter expert").

Sobol asserts that the warning was unjustified because he was still fulfilling his position's minimum requirements.  But as he repeatedly made clear over email,

Sobol no longer wanted to be asked certain questions about the FAS, even though he remained an operations specialist responsible for that region.

Lassiter believed this conduct—the January 23 teleconference and the subsequent disengagement—implicated the Postal Service's policy that employees "discharge their assigned duties conscientiously and effectively" and that they "obey the instructions of their supervisors."  ECF No. 44-3, at PageID.253 (Lassiter Decl. ¶ 28); ECF No. 44-29, at PageID.562 (Postal Service policy).  As Lassiter expressed in an email sent to Williams immediately after the teleconference, she viewed Sobol's behavior as "extremely unprofessional" and as a "[m]elt [d]own."  ECF No. 44-27, at PageID.555.  And again, under Postal Service policy, the "seriousness of the offense" can justify a letter of warning.  ECF No. 44-29, at PageID.561.  In light of this evidence, a reasonable juror could not conclude that the letter of warning—based on Sobol's "unprofessional" behavior during the teleconference and afterwards—was retaliatory.

The final allegedly retaliatory action is the denial of Sobol's appeals of the letter of warning.  He claims that both Lassiter and Rigel inappropriately referenced his complaint in their appeal decisions.  While it is true that their appeal decisions mention his complaint, those references, considered in context, cannot be read to suggest pretext.  Lassiter mentioned the complaint because she was concerned that Sobol's 138 pages of materials could contain sensitive information

50

bearing on the complaint process.  ECF No. 44-34, at PageID.575 (Lassiter's appeal decision).  She therefore reached out to the Postal Service legal department to ensure that any sensitive material was removed.  That process delayed Lassiter's review.  For Rigel, his reference to the complaint was to express that the formal complaint process, not a team teleconference, was the "appropriate[]" avenue for raising concerns.  ECF No. 44-37, at PageID.594 (Rigel's appeal decision).  The only thing this shows is that Lassiter and Rigel knew about the complaint.  Alone, that does not suggest pretext.

Sobol makes one last argument about the denial of his appeals:  he claims that Rigel denied his appeal *before* receiving it.  That, Sobol insists, demonstrates Rigel's bias.  But as Rigel explains, Sobol had sent a letter to Rigel's supervisor— who in turn referred the letter to Rigel—complaining about how Lassiter was handling his appeal.  *Id.* at PageID.593.  Rigel thought that *that* letter meant to serve as an appeal, so he issued his decision before receiving the document that Sobol intended to be his *actual* appeal.  *See id.*  This does not give rise to an inference of discrimination.

An employee's participation in a protected activity does not shield him from all disciplinary action.  Here, Sobol has not identified a genuine dispute that any of the allegedly retaliatory actions were pretextual.  With this evidence, a juror could not conclude that the Postal Service or its employees retaliated against Sobol

because he filed a complaint.  For that reason, the motion for summary judgment is GRANTED as to the retaliation claims.

### C.     Hostile Work Environment

Sobol also presses a hostile work environment claim.  Such a claim requires a plaintiff to show that he was subjected to conduct of a racial, sexual, or agist nature; that the conduct was unwelcome; and that the conduct was so severe or pervasive as to alter the conditions of employment and create an abusive working environment.  *Vasquez*, 349 F.3d at 642; *Aoyagi v. Straub Clinic & Hosp., Inc.*, 140 F. Supp. 3d 1043, 1058 (D. Haw. 2015) (same standard for age-based claims); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (holding that environment must be "severe or pervasive enough" to create "an environment that a reasonable person would find hostile or abusive").

Yet Sobol does not identify a single example of agist, racist, or sexist conduct.  He instead advances a novel theory of a hostile work environment:  the acts of alleged retaliation, when taken together, created a hostile work environment.  In support of this proposition, Sobol relies on *Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000).

The problem for Sobol's argument, however, is that *Ray* did not so hold. The Ninth Circuit in *Ray* held that a hostile work environment could itself "be the basis for a retaliation claim."  *Id.* at 1244.  It did not hold, as Sobol suggests, that

the standard elements for a hostile work environment claim are somehow displaced when the underlying conduct is alleged acts of retaliation.

In any case, the conduct in *Ray* is far more severe than what Sobol complains of.  In *Ray*, after the male plaintiff complained about the inappropriate treatment of women in the workplace, he was made "an object lesson about the perils of complaining about sexual harassment."  *Ray*, 217 F.3d at 1245.  For over a year and a half, supervisors "regularly yelled at him," called him a "liar" and a "rabble rouser," "subjected [him] to a number of pranks," and "falsely accused [him] of misconduct."  *Id.*  His supervisors blamed him for changes in management and "fostered animus in other employees."  *Id.* at 1246.  Evidence of this level of harassment precluded summary judgment on a "hostile work environment–based retaliation claim."  *Id.*

Or take *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir. 2001).  There, a male waiter was harassed by his colleagues.  He was mocked for walking "like a woman" and, often several times a day, called horrific slurs.  *Id.* at 870.  This "severe and pervasive" conduct "alter[ed] the terms and conditions" of the plaintiff's employment, giving rise to a hostile work environment.  *Id.* at 873.

Here, Sobol claims that the same actions that were allegedly retaliatory— ending his detail, not creating a new position for him, not considering him for the

Acting Manager detail, issuing a disciplinary letter of warning, and upholding that letter—created a hostile work environment.  Yet Sobol does not allege that any of these decisions had agist, racist, or sexist undertones.  And even if this conduct was motivated by Sobol's age, race, or sex, none of it was sufficiently frequent, severe, or humiliating as to create an objectively hostile work environment.  The Court therefore GRANTS the Postal Service's motion for summary judgment as to Sobol's hostile work environment claims.

###     D.     Constructive Discharge

For similar reasons, Sobol's claim for constructive discharge fails as a matter of law.  Constructive discharge occurs when discrimination causes working conditions to become "so intolerable that a reasonable person would leave the job." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000).  This is a difficult standard to meet, and a plaintiff who "fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim" cannot "meet the higher standard of constructive discharge." *Id.*

Sobol makes no arguments unique to his constructive retirement claim.  The Court therefore cannot conclude there is a genuine dispute that a reasonable person in Sobol's position would be forced to retire.  Accordingly, the Court GRANTS the Postal Service's motion for summary judgment as to the claims for constructive discharge.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is

GRANTED.

IT IS SO ORDERED.

DATED:  July 9, 2024, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge